*So Ordered* *[signature]* 8·24·09

---

## IN THE UNITED STATES BANKRUPTCY COURT

### FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re:<br><br>C. W. MINING COMPANY, *dba* Co-Op Mining Company,<br><br>       Debtor. | Bankruptcy Number: 08-20105<br><br>Chapter 7 |
| KENNETH A. RUSHTON, Chapter 7 Trustee,<br><br>       Plaintiff,<br><br>v.<br><br>STANDARD INDUSTRIES, INC.; ABM, INC.; FIDELITY FUNDING COMPANY; SECURITY FUNDING, INC.; WORLD ENTERPRISES; and UTAHAMERICAN ENERGY, INC.,<br><br>       Defendants. | Adversary Proceeding No. 09-2047<br><br>Judge Judith A. Boulden |

UTAHAMERICAN ENERGY, INC.,

        Counter-Plaintiff, Cross-
        Plaintiff and Third-Party
        Plaintiff,

v.

KENNETH A. RUSHTON, Trustee,

        Counter-Defendant,

STANDARD INDUSTRIES, INC.,

        Cross-Defendant, and

AQUILA, INC.,

        Third-Party Defendant.

---

## MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART TRUSTEE'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO UEI RECEIVABLE AND AVOIDANCE OF LIENS

The Trustee in this chapter 7 case has filed a Motion for Partial Summary Judgment as to UEI Receivable and Avoidance of Liens (Motion). The Motion seeks a determination of which party owns the proceeds of an account receivable owed by third-party plaintiff UtahAmerican Energy, Inc. (UEI) and avoidance of transfers of security interests evidenced by various financing statements and real estate filings held by Standard Industries, Inc. (Standard); ABM, Inc. (ABM); Fidelity Funding Company (Fidelity Funding); Security Funding, Inc. (Security Funding); and World Enterprises (World) (collectively "Lenders"). The parties were given an opportunity to fully brief the Motion, and oral arguments were presented to the Court on July 20, 2009. Shortly before the hearing, the Trustee filed Trustee's Motion to Strike Declaration of Charles Reynolds (Motion to Strike). The Lenders filed a responsive memorandum, but neither party addressed the

Motion to Strike at the July 20, 2009 hearing but it was not necessary for the Court to resolve the

Motion to Strike as set forth below. The Court has considered the facts properly before it, the

arguments of counsel, and has conducted an independent review of applicable law. Based on the

foregoing, the Court makes the following ruling.[1]

## I.    JURISDICTION AND LEGAL STANDARD

This Court has jurisdiction under 28 U.S.C. §§ 1334 and 157(a).[2] This is a core

proceeding under 28 U.S.C. § 157(b)(2)(F), (H), and (O), and the Court may enter a final order.

Federal Rule of Bankruptcy Procedure 7056 makes summary judgment appropriate when,

after consideration of the record, the Court determines that "there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law."[3] In applying this

standard, the Court examines the factual record in the light most favorable to the nonmoving

party.[4] The party opposing summary judgment may not rely on mere allegations or denials in its

pleadings or briefs, but must identify specific and material facts for trial and significant probative

evidence supporting the alleged facts.[5] There is no genuine issue of fact "[w]here the record

---

[1]        Standard filed a Motion to Withdraw Reference to Bankruptcy Court on April 27, 2009, and that motion is still pending before the District Court. Pursuant to Federal Rule of Bankruptcy Procedure 5011(c), "[t]he filing of a motion for withdrawal of a case or proceeding . . . shall not stay the administration of the case or any proceeding therein before the bankruptcy judge except that the bankruptcy judge may stay, on such terms and conditions as are proper, proceedings pending disposition of the motion." No party has requested a stay of this adversary proceeding, and the Court finds it otherwise appropriate to issue this Memorandum Decision as part of the ongoing administration of this adversary proceeding.

[2]        Future statutory references will be to title 11 of the United States Code unless otherwise indicated.

[3]        FED. R. CIV. P. 56(c).

[4]        *See Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995).

[5]        *Burnette v. Dresser Indus., Inc.*, 849 F.2d 1277, 1284 (10th Cir. 1988).

taken as a whole could not lead a rational trier of fact to find for the non-moving party."[6]  The

moving party has the burden of establishing that it is entitled to summary judgment.[7]

## II.  UNDISPUTED FACTS

Although the parties disagree about the ultimate meaning of the agreements at issue here,

the parties do not dispute the language contained within those agreements.  As a result, the Court

incorporates the language of those agreements as written as part of the undisputed facts before

the Court.

### A.    Agreements

In 1997, C. W. Mining *dba* Co-Op Mining Company (Debtor) entered into a Coal

Operating Agreement (Coal Operating Agreement) with C.O.P. Coal Development (COP).

Under the Coal Operating Agreement, the Debtor was granted "the exclusive authority to operate

and control [tracts of land including the Bear Canyon Mine] . . . for a term of 25 years, beginning

March 1, 1997, and extending to February 28, 2022."[8]  On March 27, 2001, the Debtor and

Standard entered into the Advance Payment Agreement under which Standard agreed that it may

make advance payments to the Debtor against future coal production.  Paragraph 3 of the

Advance Payment Agreement indicates:

> Standard may from time to time make advance payments to or on behalf of [the
> Debtor] for the purchase price of coal not yet mined, as the parties may mutually
> agree.  Any such payment shall in no way obligate Standard to make any additional
> payment.  Standard's payments to [the Debtor] are advance payments for
> purchases of coal not yet mined, for which Standard shall have full legal and

---

[6]       *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[7]       *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[8]       Reynolds Decl., Ex. 1.

equitable title to the coal as it is mined by [the Debtor], and shall not be construed as a mere loan to [the Debtor.][9]

Paragraph 13 of the Advance Payment Agreement provides that the Debtor grants to Standard a security interest in all of the Debtor's personal property, profits and proceeds now owned or hereinafter acquired.[10]

Six years later on March 5, 2007, the Debtor and Standard entered into the Coal Sales Agency Agreement (Agency Agreement). The Agency Agreement appoints Standard as the Debtor's exclusive sales agent for coal mined during the term of the Agency Agreement.[11]

Paragraph 3 of the Agency Agreement provides:

> [The Debtor] shall at no time acquire legal or equitable title to the coal mined by [the Debtor]. All legal and equitable title to the coal produced by [the Debtor] shall transfer from [the Debtor's] lessor to [Standard] immediately upon severance of the coal from its seam, thereby absolutely and irrevocably divesting [the Debtor's] lessor of title and simultaneously vesting [Standard] with all right, title and interest in and to the coal, subject to the rights of [the Debtor's] customers under the terms of their coal sales contracts, including the customer's rights to take possession of the coal and have title to the coal transferred to them. [Standard's] title to the coal shall automatically transfer from [Standard] to [the Debtor's] customers upon transfer of possession of the coal to the customers, whether by loading the coal on customers' rail cars or trucks, or as otherwise provided for in the customers' coal sales contracts.[12]

Paragraphs 8 and 9 provide:

> [Standard] may from time to time loan money to [the Debtor], or advance money to or for the benefit of or on the account of [the Debtor], for which [the Debtor] shall pay [Standard] according to the terms of any agreement for the loan or advancement of such monies.

---

[9]        Complaint, Ex. D.

[10]       *Id.*

[11]       Complaint, Ex. F at ¶¶ 1and 2.

[12]       *Id.* at ¶ 3.

Unless otherwise set by a promissory note or other agreement, any indebtedness of [the Debtor] to Debtor[13] under this Agreement shall accrue interest at twelve (12) percent per annum.

Paragraph 10 of the Agency Agreement reads as follows:

[The Debtor] irrevocably assigns, transfers, and conveys to [Standard] all of [the Debtor's] right, title, and interest to all amounts now due or to become due to [the Debtor], including but not limited to all proceeds from the sale of coal payable to [the Debtor], under any and all present and future contracts between [the Debtor] and its customers, together with all amounts payable or to become payable to [the Debtor] under any renewal, amendment, extension, modification, replacement, or substitution of such contracts. This assignment is given as an absolute assignment, transfer and conveyance, and not as a mere security interest. [The Debtor] shall indemnify and hold [Standard] harmless, and at [Standard's] request defend [Standard] at [the Debtor's] expense, from any and all claims by third parties to any interest in the assigned coal sale proceeds and any other amounts assigned, including the payment of all court costs, reasonable attorney fees, consequential and incidental damages, and other expenses of any nature whatever, that [Standard] may incur in connection with any such claim.[14]

On November 28, 2007 the Debtor entered into two contracts related to the sale of coal to one of the Debtor's customers, UEI. One was designated as the Spot Coal Supply Agreement (UEI Agreement) under which the Debtor contracted to sell coal to UEI.[15] Under the UEI Agreement as amended,[16] it was Standard that invoiced and collected payment for the purchase of the coal. The other contract designated the Assignment of Coal Sale Contract Proceeds (Assignment Agreement) was between the Debtor and Standard under which the Debtor assigned

---

[13]    *Id.* at ¶¶ 8-9. Paragraph 9 refers to "the Debtor." This reference is unclear, but reading the phrase in the context of the Agency Agreement, it appears this term actually refers to "Broker" or Standard.

[14]    Complaint, Ex. F at ¶10. Various provisions of the Agency Agreement were amended on December 20, 2007. *See* Complaint, Exh G.

[15]    Complaint, Ex. A.

[16]    The UEI Agreement was amended on February 16, 2008 to "correct a scrivener's error" and to clarify this payment structure.

to Standard all of its "right, title and interest to all amounts now due or to become due to Assignor, including but not limited to all proceeds from the sale of coal payable to Assignor, under that certain [UEI Agreement], between Assignor as Seller and [UEI] as Buyer."[17]  In the Assignment Agreement, the assignment was given as an absolute assignment and not as "a mere security interest."[18]  UEI has not made any payment on the invoices submitted under the UEI Agreement, which invoices are dated both pre- and postpetition.  UEI has held the funds totaling $2,797,246.79 (UEI Receivable) and makes no claim to the UEI Receivable.  UEI has now interpleaded the funds subject to its right to offset for attorney's fees and costs.[19]

On October 30, 2007, just a month before the execution of the UEI Agreement and the Assignment Agreement, Aquila, Inc. (Aquila), a purchaser of coal mined at the Debtor's facility, obtained a $24,841,988 judgment against the Debtor in the United States District Court for the District of Utah (District Court Action).  Before the involuntary petition was filed against the Debtor, Aquila obtained from the District Court and served a continuing writ of garnishment on UEI in an attempt to collect its judgment.  Standard moved the District Court to quash the garnishment, which motion was opposed by Aquila.  Standard also filed a complaint against UEI to collect the UEI Receivable in state court.  The state court proceeding was stayed pending resolution of the District Court Action and this bankruptcy proceeding.

---

[17]     Complaint, Ex. E.

[18]     *Id.*

[19]     UEI's Answer, Counterclaim, Crossclaim, and Third-Party Complaint.

**B.      Loans and Financing Statements**

ABM loaned the Debtor money on December 31, 2006 (ABM Loan Agreement).  As part

of the agreement, the Debtor granted ABM "a security interest in all of the Property described

below that [the Debtor] now own[s] and that [the Debtor] may own in the future (including, but

not limited to, all parts, accessories, repairs, improvements, and accessions to the Property)

wherever the Property is or may be located, and all proceeds and products from the Property"

including inventory, equipment, accounts, instruments, documents, chattel paper and other rights

to payment, general intangibles, and all inventory, accounts receivable, equipment including the

equipment listed on exhibit A of the ABM Loan Agreement.[20]  Similar loans and security interests

(although not identical) were extended to the Debtor by Security Funding on January 10, 2007

(Security Funding Loan Agreement),[21] World on April 6, 2007 (World Loan Agreement),[22] and

Fidelity Funding on December 21, 2006 (Fidelity Loan Agreement).[23]  Only the Fidelity Loan

Agreement was satisfied in full by the Debtor.

On May 18, 2007, a Uniform Commercial Code (UCC) financing statement (May 2007

Financing Statement) was filed with the Utah Division of Corporations and Commercial Code

(UDCC).  The Debtor's name on the filing is "CW Mining Company."[24]  The creditors secured by

the May 2007 Financing Statement include Security Funding, ABM, and World.  Another UCC

financing statement was filed with the UDCC on August 17, 2007 (August 2007 Financing

---

[20]      Trustee's Mem. in Supp., Ex. A.

[21]      Trustee's Mem. in Supp., Ex. B.

[22]      Trustee's Mem. in Supp., Ex. C.

[23]      Trustee's Mem. in Supp., Ex. D.

[24]      Complaint, Ex. H.

Statement) also listing the Debtor's name as "CW Mining Company."[25]  The creditors secured by

the August 2007 Financing Statement are Security Funding, ABM, and World.  On October 31,

2007, Fidelity Funding filed a UCC financing statement (October 2007 Financing Statement)

showing the Debtor as "CW Mining Company."[26]  The creditors secured by this financing

statement included ABM, Fidelity Funding, Security Funding, and World.  On November 21,

2007, ABM, Standard, Fidelity Funding, Security Funding, and World each filed separate UCC

financing statements that listed the Debtor as "CW Mining Company" (collectively November

2007 Financing Statements).  The collateral listed on the November 2007 Financing Statements

included all of the Debtor's tangible and intangible personal property including a detailed list of

specific collateral and general accounts receivable.[27]  (Collectively, the May 2007 Financing

Statement, the August 2007 Financing Statement, the October 2007 Financing Statement, and the

November 2007 Financing Statements are referred to as the Financing Statements).

    A record of financing statements is maintained by the UDCC.  The UDCC offers a

database search engine system that can retrieve financing statements filed with the UDCC.  The

UDCC is also required to maintain records showing corporations that have been organized in

Utah.  The Debtor's name as indicated on the public record maintained by the UDCC is "C. W.

Mining Company" (period after the letters and spaces in between).  In her declaration, Kathy Berg

(the director of the UDCC) indicated that when using the UDCC's database search engine system,

a query using the Debtor's organization name does not retrieve any of the Financing Statements.

---

[25]     Complaint, Ex. I.

[26]     Complaint, Ex. J.

[27]     Trustee's Mem. in Supp., Ex. K-O.

Berg explained that "[a] query with identical characters and spelling [as that of] a particular database entry, but with different punctuation or spacing than that entry in any regard, will fail to retrieve that entry under the current on-line search engine system."[28] If a search is performed using the database search engine and no results are found, the UDCC's web page informs users that errors in punctuation, spaces, and data may not bring up all active debtors.

On December 7, 2007 World, Security Funding, and Standard recorded with the Emery County Recorder Real Property Security Agreements (Real Property Filings) secured by all of the Debtor's legal, equitable, and beneficial rights, title, and interest in real property, coal and other mineral rights.[29] The Real Property Filings, signed December 6, 2007 and effective November 14, 2007, recited that the "Debtor and Creditor have previously entered into one or more contracts, under which Debtor is presently indebted to Creditor," that the Debtor is "unable to meet its obligations to Creditor as they become due, and Debtor is now in default on those obligations," that the "Debtor and Creditor mutually desire to afford Debtor a reasonable opportunity to correct its financial reverses, and thereby postpone Creditor taking legal action against Debtor as a result of Debtor's default in its obligations under the parties' prior contract(s)," and that the "Creditor shall not now or for 60 days from the effective date of this Modification Agreement take legal action against Debtor as a result of Debtor's default of its obligations under the parties' prior contract(s)."[30]

---

[28]    Berg Decl. at 2 (internal citations omitted).

[29]    Trustee's Mem. in Supp., Ex. E, F and G.

[30]    *Id.*

### C.    Bankruptcy

An involuntary chapter 11 bankruptcy petition was filed against the Debtor on January 8, 2008.  An order for relief was entered on September 26, 2008 and an order converting the case to chapter 7 on November 13, 2008.  Kenneth A. Rushton is the duly appointed chapter 7 trustee (Trustee).

Standard filed a Motion for Relief from Automatic Stay on December 1, 2008, seeking relief from the automatic stay as to the UEI Receivable so that Standard could pursue collection of those proceeds from UEI, which motion was denied without prejudice on February 2, 2009.  After further proceedings, Standard dismissed the state court collection action against UEI without prejudice in favor of resolution of the issues in this proceeding.

On February 9, 2009 the Trustee filed the within Complaint asserting nine claims for relief.  By the Motion, the Trustee now seeks partial summary judgment as follows:

- On the Third Claim for Relief — avoidance of various interests under § 544(a)
  - Count II failure of financing statements to perfect
  - Count III recovery of accounts for estate
- On the Fourth Claim for Relief — avoidance of Standard's interest in postpetition coal under § 552
- On the Seventh Claim for Relief — preservation of claims for the benefit of the estate under § 551
- On the Eighth Claim for Relief — breach of contract seeking judgment against UEI
- Granting UEI's prayer for relief in UEI's interpleader counterclaim.

Standard, ABM, Fidelity Funding, Security Funding, and World oppose the Motion.  UEI has filed an Answer, Counterclaim, Crossclaim against Standard, and Third-Party Complaint against Aquila, all in interpleader, and does not oppose giving up possession of the UEI Receivable as designated by the Court.  On August 5, 2009, the Court entered an Interim Interpleader Order requiring UEI to deposit with the Clerk of the United States Bankruptcy Court

the principal amount of $2,797,246.79[31] to hold in an interest-bearing account pending further

order of the Court.  UEI continues to oppose any ruling that it pay interest on the UEI

Receivable, and it seeks fees and costs.

## III.    DISCUSSION

### A.    UCC, the Financing Statements, and the Agreements

The Trustee urges the Court to view the various agreements between the Debtor, the

Lenders, and UEI as security agreements subject to the UCC.  In response, Standard maintains

that it had purchased the coal before it was sold to UEI and that under various agreements

between the Debtor and Standard, the Debtor was divested of any ownership interest in the coal

that it mined and any proceeds from the sale of the mined coal.  Alternatively, the Lenders assert

that the UEI Receivable (as defined in this opinion as the proceeds of the UEI Agreement) was

absolutely assigned to Standard, or that they have interests in the UEI Receivable that are not

subject to the UCC and its requirements.  Ultimately, the parties are asking the Court to

determine who is entitled to the UEI Receivable.

Based on the parties' arguments, there are four possible interpretations of the agreements.

First, the Court could determine that Standard is the owner of the coal based on its advance

payment for the coal.  Second, the Court could decide that by virtue of the Debtor's outright

assignment of the UEI Receivable, Standard is entitled to the funds subject to the remaining

claims for relief in the Trustee's Complaint.  Third, if the agreements between the Debtor and

Standard represent secured transactions, the Debtor could have retained ownership of the coal

---

[31]    There is a small discrepancy in the pleadings regarding the amount of the UEI Receivable
to be deposited with the Court some parties claiming the amount is $2,797,242.79 and others
$2,797,246.79.  The Interim Interpleader Order required UEI to deposit $2,797,246.79 with the Court.

subject to Standard's and the other lenders' properly perfected security interests and that the

Court could decide that Standard and the other lenders are entitled to the UEI Receivable.  The

fourth possible interpretation is that the Debtor retained ownership of the coal subject to

Standard's and the other lenders' security interests, but those creditors failed to properly perfect

the security interests and, therefore, the Trustee may avoid the interests under § 544(a) and

preserve the avoided liens for the benefit of the estate under § 551.  At the outset, it is important

to remember the limited scope of the Motion.  The Trustee has not asked the Court to examine

every transaction between the Debtor, its customers, Standard, and its other lenders.  The Court

takes a narrow view of the issues as they apply specifically to the UEI Agreement and the UEI

Receivable and rules within the limited scope of the Motion.

### 1.    Ownership vs. Security Interest

Standard asserts that it already purchased and owned the coal sold to UEI under the

terms and conditions of the Advance Payment Agreement.  Standard also argues that under the

Agency Agreement "[the Debtor] made an absolute assignment, transfer and conveyance to

Standard of all of [the Debtor's] right, title and interest in and to the described property"[32] which

included "proceeds from the sale of coal payable to [the Debtor], under any and all present and

future contracts between [the Debtor] and it customers . . . ."[33]  Simply put, Standard argues that,

under either theory, it is the rightful owner of the coal and, as a result, the rightful owner of the

UEI Receivable.  In contrast, the Trustee maintains that Standard did not own the coal prior to its

sale to UEI under the terms of the Advance Payment Agreement or the Agency Agreement.

---

[32]    Lenders' Mem. in Opp. at 35.

[33]    Complaint, Ex. F at ¶ 10.

Further, the Trustee maintains that there was no outright assignment or sale of the UEI

Receivable to Standard; instead, the agreements Standard relies upon to establish the assignment

are actually disguised security agreements under which the Debtor granted Standard a security

interest in the UEI Receivable.  Based on these arguments, there are two seminal issues before the

Court: (1) who owned the coal before it was sold to UEI; and (2) who is now entitled to the UEI

Receivable?

Section 541 includes as property of the estate all legal or equitable interests of the Debtor

in property including proceeds, profits, offspring, rents, or profits of or from property of the

estate.  The determination of the Debtor's interests in property is controlled by state law.  Under

Utah law, courts look to the language of a particular contract to determine its meaning and the

intent of the parties "consider[ing] each contract provision . . . in relation to all of the others, with

a view toward giving effect to all and ignoring none."[34]  "To achieve this objective, courts should

examine and consider the entire writing in an effort to harmonize and give effect to all the

provisions of the contract so that none will be rendered meaningless.  No single provision taken

alone will be given controlling effect; rather, all the provisions must be considered with reference

to the whole instrument."[35]  If the language within the four corners of a contract is unambiguous,

"the parties' intentions are determined from the plain meaning of the contractual language, and the

contract may be interpreted as a matter of law. . . [but] an ambiguity exists in a contract term or

provision if it is capable of more than one reasonable interpretation because of uncertain meanings

---

[34]    *Café Rio, Inc. v. Larkin-Gifford-Overton, LLC*, 207 P.3d 1235, 1240 (Utah 2009)
(internal citations and quotations omitted).  This principle was also articulated in *WebBank v. Am. Gen.
Annuity Serv. Corp.*, 54 P.3d 1139, 1144 (Utah 2002).

[35]    *Id.*

of terms, missing terms, or other facial deficiencies."[36]  In determining whether a contract is

ambiguous, this Court may consider "any relevant and credible evidence of contrary

interpretations" but ultimately, it is the language of the contract that controls[37] and specifically "in

the context of interpreting a security agreement, '[t]he controlling factor in determining whether a

transaction is in fact a security transaction or an absolute sale is the intent of the parties....."[38]

Standard relies on provisions found in the Advance Payment Agreement and the Agency

Agreement to establish that it purchased the coal before it was sold to UEI.  There is only one

provision found in the Advance Payment Agreement that supports Standard's position that it

previously purchased the coal.  That provision is found in paragraph 3 which reads: "Standard's

payments to [the Debtor] are advance payments for purchases of coal not yet mined, for which

Standard shall have full legal and equitable title to the coal as it is mined by [the Debtor], and shall

not be construed as a mere loan to [the Debtor]."  However, there are no terms and conditions of

the actual purchase of coal, such as those found in the UEI Agreement.  There is no provision for

price, quantity, delivery, coal specifications, or other essential terms that would be expected in a

purchase and sale agreement.  Although standing alone this provision might persuade this Court

to find that the parties intended Standard to have an advance purchase of the coal, the balance of

---

[36]     *WebBank*, 54 P.3d at 1145 (internal citations and quotations omitted).

[37]     *J.R. Simplot v. Chevron Pipeline Co.*, 563 F.3d 1102, 1109 (10th Cir. 2009) (setting forth
the standard used to interpret contracts); *see also In re Kingsport Ventures, L.P.*, 251 B.R. 841, 847
(Banrk. E.D. Tenn. 2000) (stating that "the court does not attempt to ascertain the parties' state of mind at
the time the contract was executed, but rather their intentions as actually embodied and expressed in the
contract as written") (internal citations and quotations omitted).

[38]     *WebBank*, 54 P.3d at 1144 (citing 79 C.J.S. *Secured Transactions* § 24 (1995) and 68A
Am.Jur.2d *Secured Transactions* § 5) (ellipses in original).

the contract provisions do not support such a conclusion because those provisions show that the

parties actually intended to grant Standard a security interest.

A security interest is effective when value is given, the debtor has rights in the collateral or

the power to transfer rights in the collateral to a secured party, and there is an agreement between

the parties that satisfies the evidentiary requirements of the UCC.[39] The issue here is whether the

agreements establish the existence of a security agreement between the parties, or if the

agreements do something else. Many courts have battled with the issue of whether an agreement

is a sale/assignment of collateral or a grant of a security interest in collateral. Those courts have

looked at various factors including: the language and characteristics of the agreement; which party

continues to bear the risk of loss;[40] whether the assignment was made simultaneously with the

loan; whether the payments received reduce the amount of the loan; whether any payments made

that exceed the amount of the loan are returned to the debtor; whether the debtor retains rights to

a deficiency; whether the assignee admits that his rights would be extinguished if the debt is paid

from another source;[41] whether there is a statement of an outright assignment and an intent for

---

[39]     UTAH CODE ANN. § 70A-9a-203(2)(a)-(c).

[40]     *See Colonial Leasing Co. of New England, Inc. v. Larsen Brothers Constr. Co.,* 731 P.2d
483 (Utah 1986) (examining whether an agreement is a lease or a security agreement).

[41]     *United States v. Poling,* 73 F.Supp 2d. 882, 894 (S.D. Ohio 1999) (indicating that the
following factors show that the parties intended to create a security interest instead of an absolute
assignment:
    (1) the assignment is delivered simultaneously with the loan; (2) the payments received are
    used to reduce the outstanding balance.; (3) any payments received pursuant to the
    assignment and exceeding the loan are returned to the assignor, id.; (4) the assignee retains
    a right to a deficiency on the debt if the assignment does not provide sufficient funds to
    satisfy the amount of debt; (5) the assignee acknowledges that his rights in the assigned
    property would be extinguished if the debt owed were to be paid through some other
    source; and (6) the bank treats the assignment as a method of payment of the assignment.
(internal citations omitted).

that assignment to be presently effective; whether there is language eliminating any duty on the part of the debtor to institute legal action to assume control over the property; and an automatic transfer of rights upon default.[42] Using these factors for guidance, the Court must, therefore, determine whether under these various agreements the parties intended to convey or assign an interest in the coal to Standard or whether the parties intended to grant Standard a security interest in all of the Debtor's personal property including all profits and proceeds from the appreciation, sale, use or disposition of the Debtor's property. The Court must review the Advance Payment Agreement as a whole giving effect to all of its provisions and not fixating on one.

Applying these factors to the general language of the Advance Payment Agreement as a whole, the Court determines that more factors weigh in favor of a security agreement than a purchase agreement. Under paragraph 8 of the Advance Payment Agreement, the Debtor is obligated to pay Standard amounts due either in cash from the proceeds of coal sales or in coal as a commodity for any funding Standard provides. Standard (at its sole discretion) can elect to accept payment in cash or in kind. If Standard had purchased coal from the Debtor instead of

---

[42]        *In re Las Torres Dev., L.L.C.*, — B.R. —, No.09-22872-H4-11, 2009 WL 2225806 *5-6 (Bankr. S.D. Tex. July 22, 2009) (examining the following factors when determining whether parties intended an assignment of rents to be an absolute assignment or a collateral assignment:
    1. A statement of intent to assign absolutely rights, interests, estates, or rents to the mortgagee, typically a lender, and that the assignment was intended to be presently effective.
    2. A statement of obligation on the part of the mortgagor to collect and hold rent payments solely for the benefit of the mortgagee upon default.
    3. A clause eliminating any duty on the part of the mortgagee to institute legal action in order to assume control of the property or the rents therefrom.
    4. A clause referencing the automatic transfer of rights, interests, estates, or rents upon a specified condition, normally a default.
(internal citations omitted).

making and being repaid for a loan, why then would it retain the right to be paid in either cash or coal?  Under paragraph 9, Standard may apply any payments to other obligations owed by the Debtor to Standard, but must then apply those payments to reduce the Debtor's obligations to Standard under the Advance Payment Agreement, which is a factor weighing in favor of a security interest.  There is no indication in the Advanced Payment Agreement that the risk of loss of the coal or the accounts receivable shifted at any time from the Debtor to Standard, which factor also weighs in favor of a security agreement.

The Advance Payment Agreement also includes terms and characteristics commonly found in a security agreement, and it is missing provisions that should be included in a sale agreement. For example, paragraph 13 expressly grants to Standard a security interest in the Debtor's personal property including all profits and proceeds from the sale or disposition of the Debtor's property.  Paragraph 4 establishes that interest will accrue at a rate of 9.5% annually and an annual fee will be charged to the Debtor.  Paragraphs 9 and 10 establish the parameters for the payment of debt under the agreement.  Had this been a sale agreement, these paragraphs would have addressed delivery of coal instead of payment of a debt.  In fact, the remaining provisions of the Advance Payment Agreement are devoid of language addressing the delivery of coal. Paragraph 15 addresses the Debtor's failure to pay Standard not the Debtor's failure to deliver coal to Standard.  Paragraph 16 establishes default provisions, accelerations provisions upon default, and recourse in the case of default.

Finally, the recitation in paragraph 3 that the Advance Payment Agreement "shall not be construed as a mere loan to [the Debtor]" is a gratuitous statement that does not bear on the legal interpretation of the contracted terms.  The provisions of this agreement established the parameters by which Standard would provide financing for operating expenses and continued

mining of coal to enable the Debtor to carry out plans to acquire a longwall mining system and to

provide security for repayment of that financing. It was not a purchase and sale agreement that

divested the Debtor of its ownership interest in the coal; it was simply an agreement to more

specific purchase terms in the future. Although Standard and the Debtor stated their desire to not

have the advance payments under this agreement treated as a mere loan, that statement does not

create an ambiguity that requires this Court to consider parol evidence because the effective terms

of the contract are not facially ambiguous. Even though the Advance Payment Agreement

contains some sale labels within its four corners, Article 9 § 109(1)(a) covers "a transaction,

regardless of its form, that creates a security interest in personal property." With the exception of

the sale labels, the Advance Payment Agreement contains elements of a security agreement.

Therefore, the Court finds as a matter of law that the Advance Payment Agreement should be

characterized as a security interest and not a sale or purchase agreement.

Next, Standard asserts that the Agency Agreement transferred ownership in the coal to

Standard. Standard relies on paragraph 3 of the Agency Agreement to establish that it was the

owner of the coal when it was severed from the seam and that, as a result, it did not simply have a

security interest in the coal sold by the Debtor to UEI. Paragraph 3 of the Agency Agreement

provides:

> [The Debtor] shall at no time acquire legal or equitable title to the coal mined by
> [the Debtor]. All legal and equitable title to the coal produced by [the Debtor]
> shall transfer from [the Debtor's] lessor to [Standard] immediately upon severance
> of the coal from its seam, thereby absolutely and irrevocably divesting [the
> Debtor's] lessor of title and simultaneously vesting [Standard] with all right, title
> and interest in and to the coal, subject to the rights of [the Debtors'] customers
> under the terms of their coal sales contracts, including the customer's right to take
> possession of the coal and have title to the coal transferred to them. [Standard's]
> title to the coal shall automatically transfer from [Standard] to [the Debtor's]
> customers upon transfer of possession of the coal to the customers, whether by

loading the coal on customers' rail cars or trucks, or as otherwise provided for in the customer's coal sales contracts.[43]

The primary purpose of the Agency Agreement was to appoint "Broker" (Standard) as the "Producer's" (Debtor's) "sole and exclusive agent and representative for all purposes . . . ."[44] The agreement established the brokerage fees Standard received for performing brokerage services for the Debtor. It obligated the Debtor to pay Standard for transportation and storage of coal at rail loading facilities. It required the Debtor to direct is customers to pay Standard for all coal shipped. It obligated the Debtor to pay any collection costs for contracts not paid by customers. If Standard was the owner of the coal, why was it necessary to appoint itself as the broker, establish a fee for any brokerage work, allocate liabilities and risk of loss between the parties, and assign sales proceeds to Standard? If Standard is viewed as the owner of the coal, then the Agency Agreement simply makes no sense. Furthermore, paragraph 3 is not a conveyance of the Debtor's ownership interest in the coal to Standard. If it were, then paragraph 10 which purports to irrevocably assign, transfer, and convey to Standard all right, title, and interest to all coal sales proceeds would be nonsensical and rendered meaningless.

Standard also asserts that paragraph 10 of the Agency Agreement granted it an absolute assignment of "all proceeds from the sale of coal payable to [the Debtor], under any and all present and future contracts between [the Debtor] and its customers . . . ." Although this provision purports to be an assignment, the preceding paragraphs give more structure and clarify the meaning of paragraph 10. Paragraph 8 of the Agency Agreement indicates that Standard may

---

[43]    Complaint, Ex. F at 1.

[44]    This conclusion is bolstered by language found in the Advance Payment Agreement that indicates: "Standard has successfully brokered coal mined by [the Debtor] . . . ."

from time to time loan money to the Debtor or advance money to the Debtor and that the Debtor

shall repay Standard according to the terms of those loan agreements. Paragraph 9 provides that

in addition to the loans and advances that are referenced in Paragraph 8, any indebtedness of the

Debtor to Standard generated under the Agency Agreement will accrue interest at 12% annually.

The next paragraph (paragraph 10) then grants Standard an interest in all of the Debtor's present

and future contracts. Like the Advance Payment Agreement, these provisions demonstrate that

(in addition to establishing a brokerage relationship between the Debtor and Standard) the

secondary purpose of this agreement was to grant Standard a security interest in any contract

proceeds to secure any failure of the Debtor to repay any amounts due or loans made under the

terms of the Agency Agreement or other obligations that the Debtor may owe to Standard. In

reading the Agency Agreement as a whole and attempting to give meaning to all if its provisions,

and in consideration of the juxtaposition of the assignment language directly after the loan and

indebtedness provisions, the Court concludes that the Agency Agreement is neither an outright

conveyance of the coal to Standard, nor an absolute assignment of the Debtor's proceeds of coal

sales, but instead it is a brokerage agreement that grants Standard a security interest in the

proceeds of coal sales in repayment for funds advanced or indebtedness incurred under the

Agency Agreement.[45]

---

[45]    Although the parties did not make the argument, the Court questions the validity of any
attempted outright assignment in the Agency Agreement because there is no evidence that the Debtor had a
present interest in the UEI Agreement or the UEI Receivable at the time the assignment was executed. "An
assignment of a debt not yet due and which may never become due is effective if it appears that there is an
existing contract or employment out of which the debt may arise:
　　　'[T]he existence of the contract by the terms of which something might become due was
　　　enough to support the assignment and to make possible a present transfer to the assignee of
　　　the right to receive that which might become due....'
Nevertheless, it is generally held that an assignment of a right expected to arise under a contract not yet
formed, or employment not yet existing, is ineffective to transfer such a prospective 'right.'" Matthew
Frankle, *Wage Garnishments in Bankruptcy: Riddervold Revisited*, 21 Cardozo L. Rev. 927, n.116

The plain language of these contracts are unambiguous and capable of being interpreted as a matter of law, but a reading of the agreements together also supports the conclusion that the Debtor retained an ownership interest in the coal and that under the Advance Payment Agreement and the Agency Agreement Standard did not receive an absolute assignment of all current and future coal sales proceeds. Standard's position that the Advance Payment Agreement or the Agency Agreement conveyed ownership in the coal to Standard presents numerous inconsistencies, and irreconcilable provisions arise. For example, the Debtor, not Standard, was a party to the UEI Agreement. If Standard had owned the UEI coal before it was sold to UEI, then Standard should have been a party to the UEI Agreement, and Standard should have been the party to assume obligations and liabilities under the agreement. Instead it was the Debtor that did so. Standard, not the Debtor, should have been the "Seller" of coal mined from the Bear Canyon Mine under the UEI Agreement. Next, in order to assign to an assignee an interest in property, the assignor must first actually have an interest in that property. If Standard owned legal title to all coal once it was severed from the mine (as stated in the Agency Agreement), then it was not necessary for the Debtor to state that it had assigned the UEI Receivable to Standard in paragraph 10 of that same agreement and then attempt to assign the proceeds again to Standard in the Assignment Agreement executed on November 28, 2007. If the Debtor did not own the coal, it had no right to assign the UEI Receivable to Standard under any of the agreements at issue here. Either Standard owned the coal under the Advance Payment Agreement and an outright assignment of the coal and its proceeds was not required, or the Debtor owned the coal. Standard cannot have it both ways. For the reasons articulated above, the Court finds that under the

---

(1999) (citing 3 Samuel Williston, *A Treatise on the Law of Contracts* § 413 (3d ed. 1960) (other citations omitted) (ellipses in the original).

Advance Payment Agreement and the Agency Agreement, the Debtor retained its ownership

interest in the coal before it was sold to UEI, and that these agreements are not purchase

contracts and do not grant an outright assignment of the coal or its proceeds to Standard as

alleged. Instead the Advance Payment Agreement and the Agency Agreement are disguised

security agreements under which the Debtor retained its ownership interest in the coal or any

receivable generated by the coal subject to any properly perfected security interests.[46]

Finally, Standard maintains that it owns the UEI Receivable because it was granted an

absolute assignment of the UEI Receivable under the terms of the November 2007 Assignment

Agreement. "A legal assignment is a transfer or setting over of property, or of some right or

interest in property, from one person to another; and unless in some way qualified, it is the

transfer of the assignor's whole interest in an estate, or chattel, or other thing."[47] Unlike the grant

of a security interest where the debtor retains an interest in the collateral subject to a creditor's

security interest, an assignment is an actual transfer of the debtor's interest in collateral to the

creditor. The Assignment Agreement states that "[the Debtor] (Assignor) irrevocably assigns,

transfers, and conveys to [Standard] (Assignee) all of Assignor's right, title and interest to all

amounts now due or to become due to Assignor, including but not limited to all proceeds from

the sale of coal payable to Assignor, under that [UEI Agreement], between Assignor as Seller and

---

[46]    Standard argues that the parties varied the effect of the UCC by agreement because the
Advance Payment Agreement and the Agency Agreement "provided that Standard took title to the coal as it
was severed from the real property, and that Standard's payments to [the Debtor] were advance payments
for the coal and shall not be construed as a loan." Lenders' Mem. in Opp. at 36. The Court has
determined that the payments were in fact a loan to the Debtor and that the Debtor retained an interest in
the coal subject to creditors' properly perfected security agreement. As a result, the specious language in
the Advance Payment Agreement and the Agency Agreement does not provide a basis for Standard's
alteration argument.

[47]    6 Am. Jur. 2d *Assignments* § 4 (2009). *See also Winegar v. Froerer Corp.*, 813 P.2d
104, 107 (Utah 1991) (indicating that "an assignment is the transfer of rights").

[UEI] as Buyer . . . This assignment is given as an absolute assignment, transfer and conveyance,
and not as a mere security interest." Unlike the Advance Payment Agreement and the Agency
Agreement, this document does not contain other provisions that are commonly found in
disguised security agreements. For the purposes of this Memorandum Decision, and without
determining the effect on receivables other than the UEI Agreement, the Court finds that the
Agency Agreement absolutely assigned specific proceeds to a specific creditor. There are no
conflicting provisions regarding ownership, repayment of loans, the accrual of interest, or the
grant of a security interest. It does not appear to have been given in simultaneous exchange for a
loan. Its purpose is clear. The Assignment Agreement absolutely assigned the proceeds of the
UEI Agreement to Standard. But the Court cannot at this point in the litigation award the
proceeds of the UEI Receivable to Standard. The Court notes that the Trustee's Complaint
alleges other claims for relief challenging the validity and avoidability of the Assignment
Agreement. Those claims are not currently before this Court and are beyond the scope of this
decision.[48] Until the Trustee's claims regarding the avoidability and validity of the Assignment
Agreement are resolved, the Court cannot conclude which party is the rightful owner of the UEI
Receivable. Also at this time, the Court makes no ruling regarding the effect of
§ 541(a)(6) and any impact the filing of the involuntary petition may have on Standard's interests
in postpetition proceeds of sales of the Debtor's coal to UEI or on the parties' claims to the UEI
Receivable.

---

[48] Complaint at 22-23 & 34.

2.    **Application of the UCC**

The Court has found that the Assignment Agreement absolutely assigned the proceeds of

the UEI Agreement to Standard.  As a result, the Trustee's arguments that the UEI Agreement

and the Assignment Agreement also operated to grant Standard a security interest in the UEI

Receivable and that the grant of the security interest and any sale of an "account" should be

governed by the UCC have become superfluous.  But had the Court determined otherwise and

found that the UEI Agreement and the Assignment Agreement were (like the Advance Payment

Agreement and the Agency Agreement) governed by the UCC and that an "account" was created

between the Debtor and UEI and then pledged to Standard, then the Court would have found that

neither the assignment for collection exception nor the assumed obligation exception found in

Article 9 § 109(4) apply.[49]  The purpose of Article 9 § 109(4) is to except from the UCC transfers

that are not really financing transactions.  Article 9 § 109(4)(e) provides that the UCC does not

apply to "an assignment of accounts . . . which is for the purpose of collection only."  This section

of the UCC "deals with a case in which a creditor sells its accounts or other intangibles to a

collection agency not for the purpose of financing but for the purpose of collection."[50]  Standard

asserts that its obligation under the UEI Agreement was to collect the proceeds and that, as a

result, Article § 109(4)(e) applies.  But this position would not be correct.  The Debtor did not

assign its account proceeds to Standard solely for the purpose of collection.  Instead, the Debtor

made any assignment of the proceeds in payment of debt it owed to Standard and in an attempt to

---

[49]    The Trustee has addressed a number of the other exceptions included in Article 9 § 109(4)
of the UCC, but the Lenders have not responded to those arguments so the Court will not extend its
analysis beyond the Lenders' response.

[50]    James J. White & Robert S. Summers, UNIFORM COMMERCIAL CODE §21-6 (5th ed.
2000).

grant Standard a security interest in the proceeds. Because the account assignment was not made for the purpose of collection only, this exception would not apply.

Next, Article 9 § 109(4)(f) indicates that it does not apply to "an assignment of a right to payment under a contract to an assignee that is also obligated to perform under the contract." This exception would not apply because Standard is not a signatory to the UEI Agreement, and it has only one obligation under the UEI Agreement to "submit invoices to [UEI] weekly, for shipments made during that week." Standard is not a party obligated to perform under the UEI Agreement. Under the terms of the Agency Agreement, the Debtor is the obligated party in the event of any defaults and the duties of the coal seller run to the Debtor and not Standard. Whether the Court considers the "contract" referred to in Article 9 § 109(4)(f) to be the UEI Agreement or the Agency Agreement, Standard does not have any obligations to UEI. As a result, neither of these UCC exceptions would apply.

### B.    Perfection of Security Agreements

Under the UCC, the only way for the Lenders to protect any security interest they might have in the UEI Receivable is to have properly perfected those security interests. This is accomplished by filing a UCC financing statement with the UDCC. For the reasons explained below, the Court finds that the Lenders failed to properly perfect any security interest that they may have been granted.[51]

---

[51]    The Court has determined that the Advance Payment Agreement and the Agency Agreement were not purchase agreements, but instead were security agreements under which the Debtor retained an ownership interest in the coal subject to any properly perfected security interest. Because the advances made to the Debtor under these agreements have been characterized as loans and not purchases, Standard's argument that it had already paid for the coal is without merit. The conclusion also precludes the Court from finding that the estate's claim to the UEI debt is barred by waiver or estoppel as it has been framed by the Lenders because there has been no relinquishment of an existing right by the Debtor but merely an assignment of proceeds to Standard.

Between May 2007 and November 2007, the Debtor, Standard, ABM, Fidelity Funding,

Security Funding, and World filed the Financing Statements asserting security interests in, *inter*

*alia,* equipment and accounts receivable.  These are the only financing statements filed with the

UDCC that the parties have presented that purport to perfect any security interest in the UEI

Receivable.  Under Article 9 § 502(1) of the UCC, these Financing Statements must provide the

name of the debtor and the secured party.  Article 9 § 503(1) provides: "A financing statement

sufficiently provides the name of the debtor: (a) if the debtor is a registered organization, only if

the financing statement provides the name of the debtor indicated on the public record of the

debtor's jurisdiction of organization which shows the debtor to have been organized."  The UCC

indicates that a financing statement is seriously misleading if it does not contain the debtor's

registered organization name as defined by Article 9 §503 of the UCC.[52]  If a creditor has failed to

use the registered organization name, then there is "an escape hatch"[53] available under subsection

(3) of Article 9 §506 that provides "[i]f a search of the records of the filing office under the

debtor's correct name, using the filing office's standard search logic, if any, would disclose a

financing statement that fails sufficiently to provide the name of the debtor in accordance with

§ 70A-9a-503(1), the name provided does not make the financing statement seriously

misleading."

The Debtor's registered organization name is "C. W. Mining Company" (periods after the

letters and spaces between).  The Financing Statements each list the Debtor's name as "CW

---

[52]   UTAH CODE ANN. § 70A-9a-506(1)-(2).

[53]   *See Host Am. Corp. v. Coastline Fin., Inc.,* No. 2:06CV5, 2006 WL 1579614 at *4 (D.
Utah May 30, 2006) (finding a financing statement to be seriously misleading because it failed to include
periods between the debtor's name "K. W. M. Electronics Corporation" and a search using the UDCC's
standard search logic did not reveal the financing statement) (not reported).

Mining Company" (no periods included).  The Financing Statements failed to properly list the

Debtor's registered organization name.  In addition, the Berg Affidavit indicates that using the

UDCC's standard search logic, a search of the UDCC's database using the Debtor's registered

organization name does not reveal the Financing Statements.  As a result, the Financing

Statements are seriously misleading and do not perfect any security interest in any account or the

UEI Receivable,[54] and the unperfected security interests are avoided under § 544(a).  Therefore,

the Trustee's Motion for Summary Judgment on Count II of the Trustee's Third Claim for Relief

is granted and judgment will be awarded avoiding the perfection of security interests in favor of

Standard, ABM, Fidelity Funding, Security Funding, and World under their respective Financing

Statements, and judgment will be awarded preserving, for the benefit of the estate pursuant to

§ 551, any lien described in the Financing Statements.

### C.    Postpetition Coal and Its Proceeds

Under § 552(a) "property acquired by the estate or by the debtor after the commencement

of the case is not subject to any lien resulting from any security agreement entered into by the

debtor before the commencement of the case."  The Court has already determined that any

security interests the Lenders had in the coal or its proceeds including the UEI Receivable were

not properly perfected and are avoided and preserved for the benefit of the estate, but that the

ultimate question of ownership of the UEI Receivable cannot be resolved because the Court has

found that the proceeds of the UEI Agreement were absolutely assigned to Standard and that the

---

[54]    The Lenders have argued that the standard search logic has been expanded and that "a
single additional mouse click" will lead a reasonable person to find the Financing Statements.  This is not,
however, the standard articulated in the Utah Code, and this argument is contrary to the UDCC's definition
of standard search logic articulated in the Berg Declaration.  The Young and Davis declarations do not
create a genuine issue of fact regarding what the UDCC's standard search logic is.  These declarants did
not follow the UDCC's standard search logic in obtaining the information addressed in their declarations.

validity and avoidability of the Assignment Agreement is still an issue.  As a result, the Court

cannot yet determine what portion of the UEI Receivable was after acquired property subject to

§ 552(a).

### D.    Interpleader and Counterclaim

UEI has deposited the UEI Receivable with the Court, and the Court has ordered the

funds to be held in an interest-bearing account, but two issues remain regarding the amount.  The

first is whether UEI is required to pay interest on the funds under Utah Code Ann. § 15-1-1(2)

which provides: "Unless parties to a lawful contract specify a different rate of interest, the legal

rate of interest for the loan or forbearance of any money, goods or chose in action shall be 10%

per annum."  UEI maintains that is has always been willing to turn over the funds to the rightful

owner but that it had not done so due first to Aquila's garnishment action and then to the

imposition of the automatic stay when the involuntary petition was filed.  UEI argues that an

award of prejudgment interest would be punitive in nature and should not be awarded without a

showing of undue delay or bad faith on its part.

Courts appear to be split on this issue.  Some (after examining the applicable state law)

have awarded prejudgment interest based primarily on the fact that the rightful party has been

deprived of the use of the funds and should be compensated.[55]  Others examine various equitable

factors to determine whether an award of prejudgment interest is appropriate.[56]  A review of Utah

---

[55]    *See Atlin v. Security-Connecticut Life Ins. Co.,* 788 F.2d 139, 142 (3rd Cir. 1986)
(holding that under Pennsylvania's jurisprudence, "prejudgment interest accrues as a matter of right and
provides compensation for the loss of the use of money" but that interest does not accrue after the
stakeholder pays the disputed sum into the court).

[56]    *See Gelfren v. Republic Nat'l Life Ins. Co.,* 680 F.2d 79, 82 (9th Cir. 1982) (citing
various cases in support and articulating the following factors: "(1) whether the stakeholder unreasonably
delayed in instituting the action or depositing the fund with the court; (2) whether the stakeholder used the
fund for his benefit and would be unjustly enriched at the expense of the claimants who have claim to the

law (the law applicable to the UEI Agreement)[57] reveals the following bent in awarding

prejudgment interest:

> [W]here the damage is complete and the amount of the loss is fixed as of a
> particular time, and that loss can be measured by facts and figures, interest should
> be allowed from that time and not from the date of the judgment.  On the other
> hand, where damages are incomplete or cannot be calculated with mathematical
> accuracy, such as in case of personal injury, wrongful death, defamation of
> character, false imprisonment, etc., the amount of the damage must be ascertained
> and assessed by the trier of the fact at the trial, and in such cases prejudgment
> interest is not allowed.[58]

Under Utah law, an award of prejudgment interest is appropriate when needed to provide full

compensation for actual loss, and the amount of that loss is fixed as of a particular time.  UEI has

never disputed the amount due under the terms of the UEI Agreement.  The amount of the UEI

Receivable has been fixed since the time UEI was invoiced for its last shipment of coal — the

amount due and the due date are easily ascertained.  Furthermore, UEI has never denied that it is

responsible to pay the rightful owner of the UEI Receivable for the coal it received subject to

various offsets.  But the simple fact is that the party entitled to the UEI Receivable has been

without those funds since early 2008, and it is not incumbent upon the rightful owner of the UEI

Receivable to bear the loss of the use of those funds.  Accordingly, the Court will impose

prejudgment interest pursuant to Utah Code Ann. § 15-1-1(2) beginning April 29, 2008 until July

20, 2009.

---

fund; and (3) whether the stakeholder eventually deposited the fund into the court's registry") (internal
citation omitted).

[57]     Complaint, Ex. A at ¶ 16.1 stating: "This Agreement shall be construed in accordance with
the laws of the State of Utah."

[58]     *Bjork v. April Indus., Inc.*, 560 P.2d 315, 317 (Utah 1977); *see also James Constructors,
Inc. v. Salt Lake City Corp.*, 888 P.2d 665 (Utah Ct. App. 1994) (restating the law in Utah and finding that
prejudgment interest should not be awarded on attorney fees that were not fixed until a court determined
their reasonableness).

The second remaining issue is whether UEI is entitled to its attorney's fees and costs

under paragraph 18.1 of the UEI Agreement which provides that "[i]n the event litigation

involving or relating to this Agreement is commenced by any party, the prevailing party in such

litigation shall be entitled to recover from the other parties its reasonable attorney's fees and costs

incurred in connection with such litigation and any appeal therefrom."[59]  In two-party litigation,

the determination of which party is the prevailing party is easily determined.  The plaintiff is the

prevailing party if that plaintiff succeeds in securing a judgment against the defendant.  The

defendant is the successful party if it is successful in its defense and avoids the entry of a

judgment.[60]  But determining who is the prevailing party in an interpleader action where there is a

disinterested stakeholder such as UEI and multiple parties asserting an interest in the UEI

Receivable is a more complex determination.  The question before the Court is which party should

bear the cost of that particular litigation.  Again paragraph 18.1 of the UEI Agreement provides

that "[i]n the event of litigation involving or relating to this Agreement is commenced by *any*

party, the prevailing party *in such litigation* shall be entitled to recover from the other parties its

reasonable attorney's fees and costs incurred in connection with such litigation and any appeal

therefrom."  The Trustee as the representative of the bankruptcy estate commenced this action

against UEI to determine what party was entitled to collect the UEI Receivable and to collect the

---

[59]      Complaint, Ex. A at ¶ 18.1.

[60]      *See Crowley v. Black*, 167 P.3d 1087, 1091 (Utah Ct. App. 2007).  The court in *Crowley*
employed the following test to determine which party prevailed in a landlord-tenant dispute:
        (1) contractual language, (2) the number of claims, counterclaims, cross-claims, etc.,
        brought by the parties, (3) the importance of the claims relative to each other and their
        significance in the context of the lawsuit considered as a whole, and (4) the dollar amounts
        attached to and awarded in connection with the various claims.
*Id.* (citing *R.T. Nielson Co. v. Cook*, 40 P.3d 1119 (Utah 2002).

UEI Receivable.  The Court has not resolved the issue of which party is entitled to the UEI

Receivable, so there is no prevailing party regarding that issue.  The Court has, however,

determined that UEI was a disinterested stakeholder.  UEI did not defend against any of the

substantive allegations in the Complaint, and it has never asserted an interest in the UEI

Receivable.  UEI has not through its own fault caused the conflicting claims to the UEI

Receivable that the Lenders and the Trustee assert.  And any delay by UEI in failing to interplead

the UEI Receivable is justified either by its concern with violating the automatic stay or the Aquila

garnishment.

Furthermore, at least one circuit has stated that "as a general rule, when an interpleader

action is successful, the court often awards costs, as well as attorney's fees, to the stakeholder."[61]

Although UEI has held the UEI Receivable for more than a year and a half, such inaction is

explainable when placed against the backdrop of an involuntary bankruptcy filing, a garnishment,

and two other pending cases.  UEI's actions were not dilatory, improvident, or otherwise

improper.  As a result, the Court finds that it is appropriate to award UEI its attorney's fees and

costs in conjunction with this litigation.  UEI is ordered to file an affidavit of fees and costs so

that the Court can assess the reasonableness of those fees and costs.

---

[61]     *Travelers Ins. Co. v. Murphy,* 534 F.2d 1155 (5th Cir. 1976); *see also Capson v.
Brisbois,* 592 P.2d 583, 585 (Utah 1979) (indicating that an award of attorney's fees and costs is within
the equitable discretion of the trial court and denying an award of fees and costs based on equitable
grounds).

E.     **Real Property Filings As Preferential Transfers – § 547[62]**

The Trustee has asserted that the Real Property Filings are avoidable as preferential

transfers under § 547. World, Security Funding and Standard's response is that the Real Property

Filings were transfers in payment of debts incurred by the Debtor in the ordinary course of the

parties' business and that those transfers were made according to ordinary business terms.

Alternatively, they assert that the parties intended the transfers to be contemporaneous exchanges

for new value.

Under § 547, a transfer made within 90 days of filing a bankruptcy petition to or for the

benefit of the debtor, for or on account of an antecedent debt made while the debtor was insolvent

that enables the creditor to receive more than it would have in a chapter 7 case or if the transfer

had not been made, can be avoided unless one of the statutory defenses articulated in § 547(c)

applies. There is no dispute that World, Standard, and Security Funding are all creditors of the

Debtor and that the Debtor owed each one of them significant amounts of money prior to

execution of the Real Property Filings. Nor do World, Standard, and Security Funding dispute

that the Debtor was insolvent or that the creditors received more than they would have received in

a chapter 7 filing if the grant of the security interest had not been made. Finally, the Real Property

Filings were "effective" as of November 14, 2007, executed on December 6, 2007, and were

recorded on December 7, 2007. The involuntary petition was filed on January 8, 2008. All of the

Real Property Filings that transferred new security to the creditors were executed, "effective" and

---

[62]     The Complaint does not specifically recite the facts of the Real Property Filings in the
Second Claim for Relief for Avoidance of Preferential Transfers Under § 547, nor does the Motion seek
specific relief related thereto. However, the Trustee's Mem. in Supp. and the Lenders' response
acknowledge the existence of the Real Property Filings and in section VIII of their memorandum, the
Lenders argue why the Real Property Filings are not avoidable, including arguing § 547(c)(1) and (2)
defenses. Therefore, the Court will address the issue as having been fully presented by the parties.

recorded within 90 days of the involuntary petition being filed. There are simply no disputed facts regarding the elements of § 547(b). As a result, the burden shifts to these lenders to show that one of the § 547(c) statutory defenses applies to the transfers.[63]

World, Security Funding, and Standard argue that the Real Property Filings were made in the ordinary course of the parties' business, but the undisputed facts, even viewed in a light most favorable to these lenders, do not support that conclusion. The Court agrees with the Trustee that the Real Property Filings did not constitute "payment of a debt" and that the Real Property Filings were not "incurred by the debtor in the ordinary course of business or financial affairs of the debtor" or according to "ordinary business terms."[64] A review of the Real Property Filings shows that World, Security Funding, and Standard agreed not to take action against the Debtor for 60 days so that the Debtor could have a reasonable opportunity to correct its financial problems. This forbearance was based on the Debtor's default, and it was not in accordance with the Debtor's ordinary course of business with these creditors; it was not a payment of a debt. It was a promise from the Standard, Security Funding, and World not to enforce their contractual rights against the Debtor in exchange for an interest in certain collateral.

The lenders' second statutory defense is found in § 547(c)(1), and the lenders must prove the following three elements to satisfy this defense: (1) the transfer must be for new value given to the debtor; (2) the transfer must be intended to be a contemporaneous exchange; and (3) the transfer must be in fact a substantially contemporaneous exchange.[65] New value is defined as

---

[63]     § 547(g).

[64]     § 547(c)(2).

[65]     § 547(c)(1); *see also In re Pameco Corp.*, 356 B.R. 327, 338 (Bankr. S.D.N.Y. 2006) (indicating generally that a forbearance or a lien release does not constitute new value) (citing *Official Comm. of Unsecured Creditors of 360networks (USA) Inc. v. U.S. Relocation Serv., Inc. (In re*

"money or money's worth in goods, services, or new credit, or release by a transferee of property

previously transferred to such transferee in a transaction that is neither void nor voidable by the

debtor or the trustee under any applicable law, including proceeds of such property, but does not

include an obligation substituted for an existing obligation."[66] There is simply no evidence to

support the lenders' position that new value was given because the forbearance offered in the Real

Property Filings was merely a substitution for an existing obligation.[67] And a "[f]orbearance alone

does not constitute new value."[68] Because the undisputed facts establish the statutory elements of

§ 547 and because none of the statutory defenses applies to World, Security Funding, or

Standard, the Court avoids the Real Property Filings as preferential transfers according to

§ 547(b).[69]

### F.   Motion to Strike

Neither the Trustee nor the Lenders addressed the Motion to Strike at the July 20, 2009

hearing.  The Trustee has asked the Court to strike the affidavit of Charles Reynolds because it

does not fulfill the requirements of Fed. R. Civ. P. 56(e) (which is incorporated by reference by

---

*360networks (USA) Inc.)*, 338 B.R. 194, 204 (Bankr. S.D.N.Y. 2005) (internal citations omitted)).

[66]     § 547(a)(2).

[67]     *Rushton v. E & S Int'l Enter., Inc., (In re Eleva, Inc.)*, 235 B.R. 486, 489-90 (10th Cir. B.A.P. 1999) (holding that forbearance from stopping a shipment of goods does not constitute new value but also citing a string of cases where forbearance was not considered new value); *see also Pameco Corp.*, 356 B.R. at 339 (indicating generally that a forbearance or a lien release does not constitute new value).

[68]     *Id.* (internal citations and quotations omitted).

[69]     The Trustee has also asked the Court to avoid the Real Property Filings because they did not properly perfect a security interest in the coal as "as extracted collateral" or an "account" under the UCC.  Because the Court has already determined that the Real Property Filings are avoided as preferential transfers, the Court will not address this alternative legal argument.

Fed. R. Bankr. P. 7056). Although the Court agrees that some of the statements in the Reynolds Declaration fail to meet the requirements of Rule 56(e), the Court has the ability to parse through the Reynolds Declaration to determine what is and it not admissible. Therefore, the Court denies the Trustee's Motion to Strike.

## IV. CONCLUSION

Based upon the foregoing, the Court hereby determines as follows:

1.      The Trustee's Motion for Summary Judgment on Count II of the Trustee's Third Claim for Relief is GRANTED and judgment will be awarded avoiding the perfection of any security interest in favor of Standard, ABM, Fidelity Funding, Security Funding, and World under their respective Financing Statements.

2.      Count III of the Trustee's Third Claim for Relief for avoidance under § 544(a) is DENIED subject to a subsequent determination of the remaining claims for relief seeking avoidance of pre- and/or postpetition transfers or determination of property of the estate.

3.      The portion of the Trustee's Motion seeking avoidance of World, Security Funding and Standard's Real Property Filings as preferential transfers according to § 547(b) is GRANTED.

4.      The Court GRANTS IN PART the Trustee's Fourth Claim for Relief and declares that the postpetition coal and its proceeds are free and clear of any security interest claimed by the Lenders, but declines to rule at this time on the other demands for judgment found in the Fourth Claim for Relief.

5.      The Court GRANTS the Trustee's Seventh Claim for Relief and all transfers avoided herein are preserved for the benefit of the estate under § 551.

6.      The Trustee's Eighth Claim for Relief is DENIED without prejudice.

7.   The Court has already granted in part UEI's prayer for relief in its interpleader counterclaim, and those funds have been turned over to the Court.  The Court further orders UEI to pay interest at 10% per annum beginning April 29, 2008 until July 20, 2009.  This amount will be reduced, however, after counsel for UEI submits and the Court reviews its fee application for reasonable fees and costs incurred in the interpleader action.  The Court will continue to hold the UEI Receivable in an interest-bearing account and those funds will not be released until further order of the Court.

8.   The Court orders the Trustee to prepare an order and judgment memorializing this decision within 8 days of this Memorandum Decision being entered.

---------------------------------------------- END OF DOCUMENT ------------------------------------------

_____ooo0ooo_____

## SERVICE LIST

Service of the foregoing **MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART TRUSTEE'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO UEI RECEIVABLE AND AVOIDANCE OF LIENS** will be effected through the Bankruptcy Noticing Center to each party listed below.


Michael N. Zundel
**Prince Yeates & Geldzahler**
City Center 1, Suite 900
175 East 400 South
Salt Lake City, UT  84111
        *Counsel for Plaintiff*

F. Mark Hansen
**F. Mark Hansen, P.C.**
431 North 1300 West
Salt Lake City, UT  84116
        *Counsel for Defendants and Third-Party Plaintiffs*


David R. Hague
**Fabian & Clendenin**
215 South State Street
Suite 1200
Salt Lake City, UT 84111
        *Counsel for UtahAmerican Energy, Inc.*

Keith A. Kelly
**Ray, Quinney & Nebeker**
36 South State St., Suite 1400
P.O. Box 45385
Salt Lake City, UT 84145-0385
        *Counsel for Aquila, Inc.*