**The below described is SIGNED.**



**Dated: March 31, 2014**



**R. KIMBALL MOSIER**
**U.S. Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re: | Bankruptcy Number: 08-20105 |
| **C. W. MINING COMPANY,** *dba* Co-Op Mining Company, | |
| | Chapter 7 |
| Debtor. | |
| **KENNETH A. RUSHTON,** Chapter 7 Trustee, | Adversary Proceeding No. 09-2047 |
| Plaintiff, | |
| v. | Judge R. Kimball Mosier |
| **STANDARD INDUSTRIES, INC., ABM, INC., FIDELITY FUNDING COMPANY, SECURITY FUNDING, INC., WORLD ENTERPRISES, UTAHAMERICAN ENERGY, INC.,** | **MEMORANDUM DECISION** |
| Defendants. | |

**UTAHAMERICAN ENERGY, INC.**

                Counter-Plaintiff, Cross-Plaintiff
                and Third-Party Plaintiff

v.

**KENNETH A. RUSHTON,** Chapter 7 Trustee,

                Counter-Defendant,

**STANDARD INDUSTRIES, INC.,**

                Cross-Defendant, and

**AQUILA, INC.,**

                Third-Party Defendant.

The question before the Court is whether the Estate or Standard Industries, Inc. is entitled to $2,797,246.79 that UtahAmerican Energy, Inc. (UEI) deposited with the Court (UEI Receivable). Aquila, Inc. filed a Motion for Partial Summary Judgment, in which Kenneth A. Rushton, the Chapter 7 Trustee, joined, seeking a declaration that the Trustee is entitled to the UEI Receivable for the benefit of the Estate's creditors. Standard opposes Aquila's Motion, arguing that summary judgment is premature because there is a genuine factual dispute regarding ownership of the UEI account. UEI makes no claim to the UEI Receivable.

The Court conducted two hearings on Aquila's Motion on September 3, 2013 and October 15, 2013, at which hearings Brent D. Wride of Ray, Quinney & Nebeker, P.C., appeared on behalf of Aquila, Inc.; Michael N. Zundel and Daniel C. Dansie of Prince, Yeates & Geldzahler appeared on behalf of the Trustee; and P. Matthew Cox and Kim R. Wilson of Snow, Christensen & Martineau appeared on behalf of Standard Industries, Inc.

# I.    JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(F), (H), and (O), and the Court may enter a final order.  Venue is appropriate in this District under 28 U.S.C. § 1409.

# II.    FINDINGS OF FACT

## A.  Relevant Agreements.

In 1997, C. W. Mining *dba* Co-Op Mining Company (Debtor) entered into a Coal Operating Agreement with C.O.P. Coal Development Company.  Under the Coal Operating Agreement, the Debtor was granted "the exclusive authority to operate and control [tracts of land including the Bear Canyon Mine] . . . for the term of 25 years, beginning March 1, 1997 and extending to February 28, 2022."[1]  On March 27, 2001, the Debtor and Standard entered into the Advance Payment Agreement under which Standard agreed that it may make advance payments to the Debtor against future coal production.  Paragraph 3 of the Advance Payment Agreement indicates:

> Standard may from time to time make advance payments to or on behalf of [the Debtor] for the purchase price of coal not yet mined, as the parties may mutually agree.  Any such payment shall in no way obligate Standard to make any additional payment.  Standard's payments to [the Debtor] are advance payments for purchases of coal not yet mined, for which Standard shall have full legal and equitable title to the coal as it is mined by [the Debtor], and shall not be construed as a mere loan to [the Debtor].[2]

---

[1] Exhibit 1 to the Declaration of Charles Reynolds, Doc. No. 46, at 13.

[2] Complaint, Ex. D, Doc. No. 1-4.

Paragraph 13 of the Advance Payment Agreement provides that the Debtor grants to Standard a security interest in all of the Debtor's personal property, profits and proceeds now owned or hereinafter acquired.[3]

Six years later on March 5, 2007, the Debtor and Standard entered into the Coal Sales Agency Agreement. The Agency Agreement appoints Standard as the Debtor's exclusive sales agent for coal mined during the term of the Agency Agreement.[4]  Paragraph 3 of the Agency Agreement provides:

> [The Debtor] shall at no time acquire legal or equitable title to the coal mined by [the Debtor].  All legal and equitable title to the coal produced by [the Debtor] shall transfer from [the Debtor's] lessor to [Standard] immediately upon severance of the coal from its seam, thereby absolutely and irrevocably divesting [the Debtor's] lessor of title and simultaneously vesting [Standard] with all right, title and interest in and to the coal, subject to the rights of [the Debtor's] customers under the terms of their coal sales contracts, including the customer's rights to take possession of the coal and have title to the coal transferred to them.  [Standard's] title to the coal shall automatically transfer from [Standard] to [the Debtor's] customers upon transfer of possession of the coal to the customers, whether by loading the coal on customers' rail cars or trucks, or as otherwise provided for in the customers' coal sales contracts.[5]

Paragraphs 8 and 9 provide:

> [Standard] may from time to time loan money to [the Debtor], or advance money to or for the benefit of or on the account of [the Debtor], for which [the Debtor] shall pay [Standard] according to the terms of any agreement for the loan or advancement of such monies.

> Unless otherwise set by a promissory note or other agreement, any indebtedness of [the Debtor] to Debtor under this Agreement shall accrue interest at twelve (12) percent per annum.[6]

---

[3] *Id.*

[4] Complaint, Ex. F, Doc. No. 1-6.

[5] *Id.* ¶ 3.

[6] *Id.* ¶¶ 8–9.

4

Paragraph 10 of the Agency Agreement reads as follows:

> [The Debtor] irrevocably assigns, transfers, and conveys to [Standard] all of [the Debtor's] right, title, and interest to all amounts now due or to become due to [the Debtor], including but not limited to all proceeds from the sale of coal payable to [the Debtor], under any and all present and future contracts between [the Debtor] and its customers, together with all amounts payable or to become payable to [the Debtor] under any renewal, amendment, extension, modification, replacement, or substitution of such contracts. This assignment is given as an absolute assignment, transfer and conveyance, and not as a mere security interest. [The Debtor] shall indemnify and hold [Standard] harmless, and at [Standard's] request defend [Standard] at [the Debtor's] expense, from any and all claims by third parties to any interest in the assigned coal sale proceeds and any other amounts assigned, including the payment of all court costs, reasonable attorney fees, consequential and incidental damages, and other expenses of any nature whatever, that [Standard may incur in connection with any such claim.[7]

On November 28, 2007, the Debtor entered into two contracts related to the sale of coal to UEI. One was designated as the Spot Coal Supply Agreement (UEI Agreement), under which the Debtor contracted to sell coal to UEI.[8] Under the UEI Agreement as amended, it was Standard that invoiced and collected payment for the purchase of the coal.[9] The other contract, designated the Assignment of Coal Sale Contract Proceeds (Assignment Agreement), was between the Debtor and Standard, under which the Debtor assigned to Standard all of its "right, title and interest to all amounts now due or to become due to Assignor, including but not limited to all proceeds from the sale of coal payable to Assignor, under that certain [UEI Agreement], between Assignor as Seller and [UEI] as Buyer."[10] In the Assignment Agreement, the assignment was given as an absolute

---

[7] *Id.* ¶ 10. Various provisions of the Agency Agreement were amended on December 20, 2007. *See* Complaint, Ex. G, Doc. No. 1-7.

[8] Complaint, Ex. A, Doc. No. 1-1.

[9] The UEI Agreement was amended on February 16, 2008 to "correct a scrivener's error" and to clarify this payment structure.

[10] Complaint, Ex. E, Doc. No. 1-5.

assignment and not as "a mere security interest."[11]   UEI withheld payment on invoices totaling

$2,797,246.79 (UEI Receivable) submitted under the UEI Agreement, which invoices are dated both

pre- and postpetition.   UEI has held and interpleaded the funds subject to its right to offset for

attorney's fees and costs.[12]

On October 30, 2007, just a month before the execution of the UEI Agreement and the

Assignment Agreement, Aquila, Inc., a purchaser of coal mined at the Debtor's facility, obtained a

$24,841.988 judgment against the Debtor in the United States District Court for the District of Utah

(District Court Action).   Before the involuntary petition was filed against the Debtor, Aquila

obtained from the District Court and served a continuing writ of garnishment on UEI in an attempt

to collect its judgment.   Standard moved the District Court to quash the garnishment, which motion

was opposed by Aquila.   Standard also filed a complaint against UEI to collect the UEI Receivable

in state court.   The state court action was stayed pending resolution of the District Court Action and

this bankruptcy proceeding.

**B.  The Bankruptcy.**

On January 8, 2008, Aquila, and other petitioning creditors, filed an involuntary Chapter 11

bankruptcy petition against the Debtor.   The Court entered an order for relief against the Debtor on

September 26, 2008.   On November 13, 2008, the Court converted the Debtor's Chapter 11

bankruptcy case to one under Chapter 7 and Kenneth A. Rushton was appointed Trustee.

The Trustee initiated the present adversary proceeding on February 9, 2009 and thereafter

filed a motion for partial summary judgment seeking a determination of the parties' rights to the

---

[11] *Id.*

[12] UEI's Answer, Counterclaim, Crossclaim, and Third-Party Complaint, Doc. No. 13.

proceeds of the UEI Receivable. Aquila joined in the Trustee's motion. On August 24, 2010, the Court, Judge Boulden presiding, entered its initial Memorandum Decision Granting in Part and Denying in Part Trustee's Motion for Partial Summary Judgment as to UEI Receivable and Avoidance of Liens. The Trustee and Standard sought revisions of that decision. On December 8, 2009, the Court entered its Amended Memorandum Decision Granting in Part and Denying in Part Trustee's Motion for Partial Summary Judgment as to UEI Receivable and Avoidance of Liens (Amended Memorandum Decision).[13]

In the Amended Memorandum Decision, Judge Boulden found for the Trustee on the majority of his claims in the underlying adversary proceeding. In particular, the Court found that the Debtor retained its ownership interest in the coal and Standard possessed only a security interest in the UEI Receivable and that any interest in the UEI Receivable had not been properly perfected.

On April 20, 2010, the above-captioned bankruptcy case and all associated adversary proceedings were reassigned to Judge R. Kimball Mosier. On July 2, 2010, this Court entered a final order instructing the court clerk to pay the UEI Receivable proceeds to the Trustee.[14]

Standard and other parties appealed that order and the Amended Memorandum Decision to the United States District Court for the District of Utah. The District Court addressed three general claims on appeal: "that the bankruptcy court (1) erred in interpreting the Advance Payment Agreement and Agency Agreement as loan and security agreements rather than purchase agreements, (2) erred in finding that the Appellants' UCC financing statements were ineffective to perfect the

---

[13] Doc. No. 173.

[14] Doc. No. 238.

7

Case 09-02047   Doc 324   Filed 03/31/14   Entered 03/31/14 16:43:19   Desc Main
Document     Page 8 of 16

Appellants' underlying security interests, and (3) granted relief in its final order that was overly broad and impermissibly at odds with its Amended Memorandum Decision."[15]

The District Court issued its ruling on March 8, 2013, affirming the bankruptcy court's decisions in part and reversing them in part. In particular, the District Court found error in the conclusion that the Advanced Payment Agreement and Agency Agreement were unambiguous. The District Court affirmed, however, the determination that Standard failed to properly perfect any security interest in any account or the UEI Receivable. In addition, the District Court held that the final order was not impermissibly broad or contrary to the Amended Memorandum Decision. The District Court then remanded the case to this Court.

### III.  SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. 56(a), made applicable to adversary proceedings by Fed. R. Bankr. P. 7056, the Court is required to grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[16] Substantive law determines which facts are material and which are not. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[17] Whether a dispute is "genuine" turns on whether "the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party."[18] In sum, the

---

[15] *Rushton v. Standard Industries, Inc. (In re C. W. Mining Co.)*, No. 2:10-CV-271 TS, at 11 (D. Utah Mar. 8, 2013).
[16] FED. R. CIV. P. 56(a).
[17] *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).
[18] *Id.*

Court's function at the summary judgment stage is to "determine whether there is a genuine issue for trial."[19]

The moving party bears the burden to show that it is entitled to summary judgment,[20] including the burden to properly support its summary judgment motion as required by Rule 56(c).[21] Once the moving party meets its initial burden, "the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter."[22]  The nonmoving party may not rely solely on allegations in the pleadings, but must instead show "specific facts showing that there is a genuine issue for trial."[23]

When considering a motion for summary judgment, the Court views the record in the light most favorable to the nonmoving party.[24]

## IV. ANALYSIS

Because the District Court found the Advanced Payment Agreement and Agency Agreement were ambiguous, Standard maintains that there is a possible scenario under which the UEI Receivable belongs to Standard instead of the Estate and the UCC does not apply.  Specifically, Standard argues that the parties varied the effect of the UCC by agreement because the Advance Payment Agreement and the Agency Agreement provided that Standard took title to the coal as it was severed from the real property.  Standard's position is that it sold its own coal directly to UEI on its own behalf.  Standard admitts that there is no contract between it and UEI but argues that the

---

[19] *Id.* at 249.
[20] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
[21] *Murray v. City of Tahlequah, Okla.*, 312 F.3d 1196, 1200 (10th Cir. 2002).
[22] *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994).
[23] *Celotex*, 477 U.S. at 324.
[24] *McKibben v. Chubb*, 840 F.2d 1525, 1528 (10th Cir. 1988) (citation omitted).

invoices generated for UEI's purchases of coal constitute prima facie evidence of an account. Standard notes that the invoices are made in its name, not the Debtor's, and that nowhere on the invoices is there an indication that Standard sold coal to UEI on the Debtor's behalf or under the Debtor's account.[25]  Standard concludes that because it owned the coal and the invoices are for its account, the UCC is inapplicable.  Standard argues that these invoices, which it asserts constitute prima facie evidence of an account, preclude entry of summary judgment in favor of Aquila and the Trustee.

The problem for Standard is that the invoices do not create a genuine dispute of a material fact regarding the ownership of the UEI Receivable.  It is undisputed that the Debtor and UEI entered into the UEI Agreement.  It is also undisputed that the coal UEI purchased was purchased pursuant to the UEI Agreement and not pursuant to an agreement or contract with Standard.  In the Assignment Agreement, the Debtor clearly **assigned its interest in the proceeds** of the UEI Agreement to Standard.[26]  The Debtor **did not assign the UEI Agreement** to Standard, it only assigned its right to receive payment under the UEI Agreement.  Even if the Assignment Agreement, like other agreements executed by the Debtor and Standard, is ambiguous in some respects not germane to the motion before the Court, it is clear about what the Debtor assigned to Standard.

It is also undisputed that the Debtor and UEI later amended the UEI Agreement "to correct scrivener's errors in the [UEI Agreement] so as to reflect the original intent of the parties[.]"[27]  The amendment clarified that Standard, not the Debtor, would invoice UEI for the coal shipments.[28]  If

---

[25] The invoices can be found as Exhibit C to the Trustee's Complaint, Doc. No. 1-3. .
[26] *See* UEI Agreement and Assignment Agreement, which can be found as Exhibits A and E to the Trustee's Complaint, Doc. Nos. 1-1 and 1-5, respectively.
[27] Complaint, Ex. B, Doc. No. 1-2.
[28] *Id*.

it was the original intent of the parties that Standard would submit invoices to UEI and that UEI would remit payments to Standard, it is not surprising that Standard's name should appear on the invoices. That the invoices contain no reference to the Debtor does not suggest that the invoices were generated pursuant to a separate account that UEI created with Standard. Rather, when read in conjunction with the UEI Agreement, as amended, and the Assignment Agreement, the invoices were clearly generated pursuant to the UEI Agreement.[29]

The cases cited by Standard for the proposition that an invoice is prima facie evidence of an account are not on point. In *Peace Mark (Holdings)*,[30] a magistrate judge recommended that the court enter a default judgment against the defendant, holding that the plaintiff had properly stated a claim for "goods sold and delivered" and, in the alternative, for "account stated." The court found that the plaintiff's invoices were sufficient to establish a prima facie claim for account stated, which, under New York law "refers to a promise by a debtor to pay his creditor a stated sum of money that the parties had agreed upon as the amount due."[31] In *Ultimate Medical Services*,[32] the Louisiana Court of Appeal affirmed the trial court's determination that, "based on the testimony and documentary evidence," three invoices "evidenced an open account relationship" between the plaintiff and the defendant. Under Louisiana law, a claim for open account is defined as including "any account for which a part or all of the balance is past due, whether or not the account reflects one

---

[29] For example, the invoices charge $27.50 per ton of Mine Run Coal—SCT, and $28.95 per ton of Mine Run Coal—Wildcat. These are the prices that appear in paragraph 8 of the UEI Agreement.

[30] *Peace Mark (Holdings) Ltd. v. Int'l Watch Group, Inc.*, No. 08-CV-2460, 2010 WL 986559 (E.D.N.Y. Feb. 1, 2010).

[31] *Id*. at *3. Standard also cites *Rothstein & Hoffman Electric Service, Inc. v. Gong Park Realty Corp.*, 829 N.Y.S.2d 91 (N.Y. App. Div. 2007) for a similar proposition: a plaintiff's invoices "established a prima facie case to recover on an account stated theory" under New York law.

[32] *Ultimate Med. Servs., Inc. v. Shannon*, No. CA 09-559, 2009 WL 4831626 (La. Ct. App. Dec. 16, 2009).

or more transactions and whether or not at the time of the contracting the parties expected future transactions."[33]

These cases do not state that invoices constitute prima facie evidence of an account under the UCC.[34]  While it may make good logical sense that, in general, a party that has an account with another will invoice the purchasing party for property sold or services rendered, the invoices themselves do not necessarily show to whom the account belongs.  As discussed above, the fact that Standard's name alone appears on the invoices to UEI is consistent with the UEI Agreement and the Assignment Agreement and is insufficient to establish a genuine dispute regarding whether Standard had a separate account with UEI.[35]

It is undisputed that Standard did not have a separate coal sales contract with UEI.  Whether Standard owned the coal is not material to this motion.  The undisputed facts clearly establish that the UEI Receivable resulted from the purchase of coal sold pursuant to the UEI Agreement, and was not dependant on the source of the coal sold.  Even if Standard owned the coal that was sold to UEI, it did not own the UEI Receivable, except through the Assignment Agreement.  Standard only held an assignment of the proceeds of the UEI Agreement and the resolution of other facts that may be

---

[33] *Id*. at 2. *ABC School Uniforms, Inc. v. Le Hig's Uniform Center*, 446 So.2d 780 (La. Ct. App. 1984), also cited by Standard, similarly stands for the proposition that a plaintiff can establish a prima facie case for an open account under Louisiana law by introducing invoices and the testimony of a witness who was personally involved in the shipment of the goods in question.

[34] In discussing whether invoices constitute instruments under Article 9 of the UCC, the U.S. Bankruptcy Court for the District of New Jersey stated that "[i]nvoices are statements which are nothing more than pieces of paper reflecting a record of a transaction. . . . Mere possession of an invoice does not have any legal significance or evidence a right to payment." *Wawel Sav. Bank v. Yale Factors NJ LLC*, No. 06-2003, 2010 WL 3608013, at *3 (Bankr. D.N.J. Sept. 13, 2010).

[35] The Court is not concluding, however, that the Debtor still owned the account at the time Standard generated the invoices. Instead, the Court is concluding that Standard's theory that the invoices determine ownership of the account is incorrect. Standard likely owned the account, but it owned it through an assignment from the Debtor, which subjected the account to Article 9 of the UCC.

12

in genuine dispute in this case will not alter this fact, and are therefore not material to this motion.

      The assignment of the UEI Agreement proceeds is subject to perfection under Article 9 of the UCC.  This Court previously ruled, neither the assignment for collection exception nor the assumed obligation exception found in Article 9 § 109(4) apply to the Debtor's assignment of the UEI Agreement proceeds to Standard, and it repeats that conclusion here.  The purpose of Article 9 § 109(4) is to except from the UCC transfers that are not really financing transactions.  Article 9 § 109(4)(e) provides that the UCC does not apply to "an assignment of accounts . . . which is for the purpose of collection only."  This section of the UCC "deals with a case in which a creditor sells its accounts or other intangibles to a collection agency not for the purpose of financing but for the purpose of collection."[36]  Standard asserts that its obligation under the UEI Agreement was to collect the proceeds and that, as a result, Article § 109(4)(e) applies.  But this position would not be correct. The Debtor did not assign its account proceeds to Standard solely for the purpose of collection. Instead, the Debtor made any assignment of the proceeds in payment of debt it owed to Standard and in an attempt to grant Standard a security interest in the proceeds.  Because the account assignment was not made for the purpose of collection only, this exception would not apply.

      Next, Article 9 § 109(4)(f) indicates that it does not apply to "an assignment of a right to payment under a contract to an assignee that is also obligated to perform under the contract."  This exception would not apply because Standard is not a signatory to the UEI Agreement, and it has only one obligation under the UEI Agreement to "submit invoices to [UEI] weekly, for shipments made during that week."  Standard is not a party obligated to perform under the UEI Agreement.  Under the terms of the Agency Agreement, the Debtor is the obligated party in the event of any defaults and

---

[36] James J. White & Robert S. Summers, UNIFORM COMMERCIAL CODE § 21-6 (5th ed. 2000).

the duties of the coal seller run to the Debtor and not Standard.  Whether the Court considers the "contract" referred to in Article 9 § 109(4)(f) to be the UEI Agreement or the Agency Agreement, Standard does not have any obligations to UEI.  As a result, neither of these UCC exceptions would apply.

The District Court affirmed this Court's conclusion in the Amended Memorandum Decision, that Standard failed to properly perfect its security interest in the UEI Receivable.  Therefore, the Trustee's interest in the UEI Receivable is superior to that of Standard's and summary judgment is appropriate.

## V.    CONCLUSION

The Debtor executed a contract with UEI for the sale of coal and later assigned its right to payment under that contract to Standard but did not assign the contract.  There is no genuine dispute that Standard did not have a separate account with UEI, and the invoices that Standard sent to UEI do not establish a separate account. The assignment of the UEI Agreement proceeds to Standard is subject to perfection under Article 9 of the UCC.  Because Standard did not properly perfect its interest in the UEI Receivable, the Trustee is entitled to it for the benefit of the Estate's creditors. Therefore, the Court will grant Aquila's Motion for Summary Judgment. A separate order will accompany this Memorandum Decision.

_____END OF DOCUMENT_____

14

_____ooo0ooo_____
## SERVICE LIST

Service of the foregoing **MEMORANDUM DECISION** will be effected through the Bankruptcy Noticing Center to each party listed below.


Brent D. Wride
Steven W. Call
Elaine A. Monson
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
Salt Lake City, UT 84145-0385
 *Attorneys for Aquila, Inc.*

Peter W. Billings, Jr.
Douglas J. Payne
FABIAN & CLENDENIN
215 South State Street, Suite 1200
Salt Lake City, UT 84111-2323
 *Counsel for the Chapter 11 Trustee*

Kenneth A. Rushton, Trustee
P.O. Box 212
Lehi, UT 84043
 *Former Chapter 7 Trustee*

Michael N. Zundel
James C. Swindler
Glenn R. Bronson
Tyler O. Waltman
Andrew B. Clawson
Daniel C. Dansie
PRINCE, YEATES & GELDZAHLER
15 West South Temple, Suite 1700
Salt Lake City, UT 84101
 *Counsel for the Former Chapter 7 Trustee*

15

Kim R. Wilson
David L. Pinkston
P. Matthew Cox
SNOW, CHRISTENSEN & MARTINEAU
10 Exchange Place, Eleventh Floor
P.O. Box 45000
Salt Lake City, UT 84145-5000
     *Attorneys for Standard Industries, Inc.; ABM, Inc.;*
     *Fidelity Funding Company; Security Funding, Inc.;*
     *and World Enterprises*

David R. Hague
FABIAN & CLENDENIN
215 South State Street, Suite 1200
Salt Lake City, UT 84111
     *Attorney for UtahAmerican Energy, Inc.*